UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| HOLLY NYGAARD and QUANELL GEE, on behalf of themselves and all others similarly situated, | ) ) ) ) | C/A: 4:20-CV-00233-JD |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | **DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION TO CERTIFY FRCP 23 CLASS** |
| BEACH HOUSE HOSPITALITY GROUP, LLC d/b/a BEACH HOUSE BAR & GRILL; and EREZ SUKARCHI, individually, | ) ) ) ) ) | |
| Defendants. | ) | |

On December 1, 2021, nearly two (2) years after this case was commenced, Plaintiffs, Holly Nygaard and Quanell Gee, on behalf of themselves and all others similarly situated ("Plaintiffs"), filed a Motion to Certify a class pursuant to Rule 23 of Federal Rule of Civil Procedure ("FRCP"). (See ECF No. 74). Plaintiffs request class certification regarding Plaintiffs' cause of action for violation of the South Carolina Payment of Wages Act ("SCPWA") as it pertains to "Defendants' workplace policies and practices of taking deductions from Plaintiffs' tips for 'walkouts; wrong orders; and silverware.'" (See ECF No. 74-1, p. 2). Plaintiffs seek to define their class as, "All individuals who were employed by Beach House, as servers or bartenders, at any time from January 24, 2017 through May 14, 2020." (Id.). Plaintiffs then ***falsely*** assert "Defendants required each and every one [of Beach House's servers and bartenders] to pay, from their tips received, Defendants for walkouts; wrong orders; and silverware." (Id. at p. 6). This false assertion is a fatal flaw in Plaintiffs' Motion and underscores the key reason why class certification is inappropriate in this case.

In sum, Plaintiffs' Motion to Certify is premised upon the false assertion that Beach House enacted a uniform policy that was applied to and enforced against all servers and bartenders during the entire relevant time period.  Relying upon this false assertion, Plaintiffs then incorrectly argue all they need to do to succeed in this case is prove such policies violated the SCPWA.

Plaintiffs' above-framing of this case is wrong, and their Motion to Certify should be denied because no such uniform policy existed that was applied to and enforced against all employees all of the time during the time period, thereby requiring each individual plaintiff to prove both liability and damages in this case.

All of the evidence in this case, including the deposition testimony of the Plaintiffs themselves, demonstrates Beach House maintained ***no uniform policy*** that was automatically or uniformly enforced against every server and bartender during the time period.  On the contrary, Beach House allowed its managers the subjective discretion to determine whether to charge servers and/or bartenders for silverware, walkouts, or wrong orders on a case-by-case basis, and managers only did so intermittently at best, many times not at all.  As a result, Beach House may have required some servers and bartenders to pay for such costs some of the time while never requiring others to do so at all.  Thus, contrary to Plaintiffs' arguments within its Motion to Certify, if the Court certified this case as a class action under Rule 23, FRCP, what would have to be determined is to whom Beach House is ***liable*** (i.e., which servers and bartenders were actually required to pay for silverware, walkouts, or wrong orders during the relevant time period).[1]  Stated another way, in order to even ascertain a class in this case, fact-specific, individual inquiries would have to be made to determine liability with regard to each and every Beach House bartender or server during

---

[1] Defendants concede that requiring a server or bartender to pay for silverware, walkouts, or wrong orders violates the SCPWA.  However, before any damages can be determined, fact-specific, individualized inquires must be made as to each server or bartender to determine liability.

the relevant time period. Moreover, no two Plaintiffs or putative class members were subjected to the same requirements under the same terms and conditions like Plaintiffs would have this Court believe.

Therefore, as set forth in detail below, Defendants, Beach House and Erez Sukarchi ("Sukarchi") (collectively, "Defendants"), oppose Plaintiffs' Motion to Certify on the grounds that: (1) Plaintiffs cannot satisfy the typicality or adequacy of representation factors under Rule 23(a), FRCP; (2) Plaintiffs cannot satisfy Rule 23(b)(3)'s predominance requirement or demonstrate a class action is the superior method for administrating this case; (3) Plaintiffs' proposed class is not ascertainable and/or readily identifiable; and (4) Plaintiffs' Motion is untimely. Plaintiffs' Motion to Certify is thus fatally flawed and should be denied accordingly.

## I.    NATURE OF CASE

Beach House is a bar and restaurant located on North Ocean Boulevard in Myrtle Beach, South Carolina. The Named Plaintiffs, Holly Nygaard ("Nygaard") and Quanell Gee ("Gee"), are individuals who were formerly employed by Beach House as a bartender (Nygaard) and as a server (Gee). The Named Plaintiffs filed this lawsuit against Defendants on January 23, 2020, alleging a Collective Action under the Fair Labor Standards Act, 29 U.S.C. § 201, et. seq. ("FLSA"), and alleging a Class Action for violation of the SCPWA, S.C. Code Ann. § 41-10-10, et. seq. under Rule 23, FRCP. (See ECF No. 1).

In May 2020, Defendants consented to Plaintiffs' Motion for Conditional Class Certification.[2] (See ECF No. 22). A thirty (30) day Opt-In Period was then held, during which time court-approved notice and consent to join lawsuit forms were sent to the putative class by a

---

[2] Defendants consented to conditional class certification early in this case; however, now that extensive discovery has been conducted, Defendants expect to move for de-certification.

third-party administrator.  (See ECF No. 25).  The Opt-In period ended on July 1, 2020.  Following

conclusion of the Opt-In period, there exists a total of thirteen (13) Plaintiffs in this case, of which

twelve (12) have asserted damages.

All Plaintiffs in this lawsuit are former Beach House servers and bartenders who were

tipped employees under the FLSA.  Beach House paid Plaintiffs a direct, or hourly, rate less than

the statutory minimum wage of $7.25 per hour by utilizing the FLSA's Tip Credit provision.  As

it pertains to the Plaintiffs' Motion to Certify, Plaintiffs have alleged tips Plaintiffs remitted into

the Beach House Tip Pool were redistributed to Beach House for the cost of: (a) lost or disposed

of silverware ("silverware"); (b) customers who left the restaurant/bar without paying their tabs

("walkouts"); and/or (c) incorrect orders placed by Plaintiffs ("wrong orders").  (See ECF No. 57,

pp. 5-6, para. 25(B-D).  Plaintiffs are seeking the recovery of all amounts Plaintiffs were required

to pay Beach House for silverware, walkouts, and wrong orders.  (Id. at p. 10, paras. 56-57).

Defendants  do  not  dispute  that  Beach  House's  management, ***intermittently (e.g.,***

***sometimes), and on a discretionary and case-by-case basis***, required some of its servers and/or

bartenders to pay Beach House for the cost for silverware, walkouts, and/or wrong orders, or a

discounted portion of such cost, during the time period pertinent to this lawsuit.[3]  Defendants also

do not dispute that they have no records regarding which servers or bartenders actually paid for

silverware, walkouts, and/or wrong orders, the dates on which the servers or bartenders paid for

such costs, or the amounts that were paid.  (See Ex. 1 – Depo. of Ghidella Excerpts, pp. 195; Ex.

---

[3] Defendants do not dispute that when Beach House required such payments, those payments
violated the SCPWA.  However, Defendants deny that any violations of were willful.  Moreover,
although Beach House acknowledges it was likely Plaintiffs paid for silverware, walkouts, and/or
wrong orders out of money they received from customers as tips, Beach House did not specifically
require these payments be made from Plaintiffs' tips.  (See Ex. 5 – 30(b)(6) Depo. of Beach House
Excerpts, p. 72).

5 – 30(b)(6) Depo. of Beach House Excerpts, pp. 36-37, 40).  Likewise, none of the Plaintiffs in this case maintained any records regarding when they paid Beach House for silverware, walkouts, and/or wrong orders or of the amounts they paid, if any.[4]  Thus, this case, whether brought by twelve individuals or by two individuals on behalf of a larger class, would nonetheless require heavily individualized proof of both liability, e.g. whether he or she was actually required to pay for a wrong order or walkout, and, if so, how much and how often.  Thus, despite Plaintiffs' assertions, no class of "all servers and bartenders" exists; and, in order to determine Beach House's liability to the proposed class, heavily individualized inquiries of each putative class member must be made.

## II.    <u>SUMMARY OF ARGUMENTS</u>

This is not a case whereby one uniform policy applied to and was enforced against all members of a class all of the time, in which any one member of that class, equally aggrieved by that policy, could come forward to litigate liability in a representative capacity on behalf of the entire equally aggrieved class.  Such a case would be ripe for class certification.  This is not that case, for Beach House applied and enforced no uniform policy against all class members all of the time.  By their own testimony, the experiences of the various Plaintiffs varied greatly from one another by individual circumstance, time, and manager on duty.  As such, no one individual Plaintiff may adequately represent the interests of another, much less all other servers and bartenders during the entire period.  Whether Beach House is liable to one particular Plaintiff is in no way indicative of whether Beach House is liable to another server or bartender.  Beach House's

---

[4] (<u>See</u> Ex. 6 – Depo. of Marrone Excerpts, pp. 51-52; Ex. 9 – Depo. of Moss Excerpts, p. 36; Ex. 10 – Depo. of Byrd Excerpts, pp. 29, 50; Ex. 12 – Depo. of Nygaard Excerpts, p. 118; Ex. 13 – Depo. of Gee Excerpts, pp. 53-54; Ex. 14 – Depo. of McColgan Excerpts, p. 40; Ex. 15 – Depo. of Lubeck Excerpts, p. 51).

liability to each Plaintiff and/or putative plaintiff, if any, is unique to that particular individual, and would necessarily have to be proven by that individual, together with his or her corresponding damages.[5]  Thus, this case should not be certified as a class action.

### III.    FACTUAL BACKGROUND/PROCEDURAL HISTORY

The parties have engaged in extensive written discovery in this case, and have completed a total of sixteen (16) depositions.  Plaintiffs' counsel has taken the depositions of Beach House's General Manager, Steve Ghidella; the Rule 30(b)(6), FRCP, deposition of Beach House; and the depositions of Beach House managers Billy Cargill, Dave Goodbread, Scott Emde, and Tim Kerr. Defense counsel has taken the depositions of ten (10) of the Plaintiffs in this case: Holly Nygaard, Quanell Gee, William Lubeck, Alexis McColgan, Dave Williams, Amanda Powers, Aisha Moss, Madalynn Marrone, Meredith Byrd, and Victoria Miller.   The aforementioned deposition testimony has revealed the following:

- Beach House did not require *every* bartender and server to pay for silverware, walkouts, or wrong orders,[6] nor did Beach House require such payments during *every* shift its servers and bartenders worked during the relevant time period.  Rather, such payments were required on a case-by-case basis, intermittently at best, depending upon a number of subjective factors, most notably the individual circumstances of each situation;[7] and

---

[5] After that initial liability determination has been made, then the Court would have to make individualized damages determinations regarding: *when* each server or bartender was required to pay for such costs; *the number of times* each server or bartender was required to pay for such costs; and *the total amount of money* each server or bartender paid to Beach House for such costs.
[6] (See Ex. 6 – Depo. of Marrone Excerpts, pp. 44-45, 46) *(wherein Ms. Marrone testified that although she had customers walk out on her without paying while she was employed as a server at Beach House, Beach House never required Ms. Marrone to pay for such walkouts)* (emphasis added).
[7] (See Ex. 1 – Depo. of Ghidella Excerpts, pp. 205-206, 209; Ex. 2 – Depo. of Cargill Excerpts, pp. 83-88; Ex. 3 – Depo. of Goodbread Excerpts, pp. 54, 63-65, 69-71; Ex. 4 – Depo. of Emde Excerpts, pp. 46-48, 50-51; Ex. 5 – 30(b)(6) Depo. of Beach House Excerpts, pp. 36-37, 40; Ex. 6

- the amounts Plaintiffs paid for silverware, walkouts, and/or wrong orders, if any, as well as the frequency with which Plaintiffs were required to pay, vary greatly;

Therefore: (1) there are servers and/or bartenders who ***did not pay*** for silverware, walkouts, and/or wrong orders during the relevant time period; and (2) even if all of Beach House's servers and bartenders had been required to pay for silverware, walkouts, or wrong orders on every shift, which they did not, each individual server's and bartender's payments would be vastly different depending upon the individual circumstances surrounding each incident, the manager on duty at the time of the incident, and the time period during which that the individual employee was employed. Each of these individual factors must be individually analyzed to determine liability since there was no uniform policy in place that applied equally to all servers and bartenders all of the time during the time period. Further, if a given server or bartender can provide evidence that he was required to and actually did pay for a walk-out, wrong order, or silverware from his tips, he would then be required to provide evidence of the number of wrong orders or walkouts he actually experienced, whether he was required to pay for the tab depending upon each incident's circumstances, and whether the tab was discounted, either in whole or in part, by the manager on duty. As a result, no two Plaintiffs' or putative plaintiffs' claims are alike.

A.  **Beach House's Requirement of Servers and Bartenders to Pay for Silverware, Walkouts, and Wrong Orders Was Enforced Intermittently, At the Discretion of the Managers, and On A Case-By-Case Basis.**

All evidence in this case demonstrates Beach House did not require all of its servers and bartenders to pay Beach House for silverware, walkouts, and wrong orders throughout the time

---

– Depo. of Marrone Excerpts, pp. 22, 46-47; Ex. 7 – Depo. of Williams Excerpts, pp. 91-94, 98, Ex. 8 – Depo. of Powers Excerpts, pp. 25-26, Ex. 9 – Depo. of Moss Excerpts, pp. 30, 34; Ex. 10 – Depo of Byrd Excerpts, pp. 28, 31, Ex. 11 – Depo. of Miller Excerpts, pp. 32-33, 40-41; Ex. 12 – Depo. of Nygaard Excerpts, pp. 51, 74-75; Ex. 14 – Depo. of McColgan Excerpts – 54-55).

period pertinent to this case. Rather, managers intermittently charged servers and/or bartenders for such costs at their own discretion and on a case-by-case basis.

1.     **Beach House Managers' Testimony**

For example, Beach House's General Manager, Steve Ghidella testified, as follows:

Q:     The Beach House ha[d] a policy where the managers on duty could require the servers and bartenders to pay for silverware?

A:     Yes.

Q:     Was that on a discretion[ary] basis on the manager on duty?

A:     Yes. It was done very, very intermittently.

…

Q:     Okay. And Beach House would require the server or bartender to pay for that wrong order?

A:     Not every time but…

Q:     It was in force at the discretion of the manager on duty?

A:     Yeah, kind of used as a tool, just like the walkout situation…obviously if it was the first time the server did it, you know, just say hey, pay attention next time, try to write the orders down, give them tips on how to not make that mistake again. And then, you know, if it happened again or third time, then it was like hey, we have an issue here, you can't – you know, you can't keep making these same mistakes. And if it just continued, then the person wouldn't work there anymore.

Q:     Okay. Did Beach House have a policy during the time period that when there was a wrong order that it was the discretion of the manager on duty as to whether he required the server or bartender to pay for the wrong order?

A:     That is correct.

(Id. at pp. 206, 209).

Similarly, Billy Cargill, Dave Goodbread, and Scott Emde, who were managers on duty at Beach House during the pertinent time period, testified that although they each required servers and/or bartenders to pay for silverware, walkouts, and wrong orders at various times: (a) whether they required a server or bartender make such payments; and (b) the amount they required a server

or bartender to pay differed depending upon the circumstances of each occasion.[8]  For example,

Billy Cargill testified, in pertinent part, as follows:

> Q:     [D]id you always require the server or bartender to pay for a wrong order?
> A:     No, sir.
> Q:     …Did you always require servers and bartenders to pay for walk-outs?
> A:     No, sir.
> Q:     Sometimes, you would let them slide, yes?
> A:     Yeah.
>                                 …
> Q:     What were some reasons you would not require a server or bartender to pay for a walk-out?
> A:     Rough day, low sales, not very much business as opposed to it being a slammed summer day…
>                                 …
> Q:     Okay. Now, my understanding is from the servers and bartenders is that Beach House would not discount the higher price entrees [for a wrong order]; is that correct?
> A:     It depends.
> Q:     Depends on what?
> A:     Depends on who the manager was.
> Q:     Okay. So what was your policy?
> A:     I did half off most times.

(Ex. 2 – Depo. of Cargill Excerpts, pp. 83, 85).  Mr. Goodbread testified, as follows:

> Q:     …Beach House had an unwritten policy where it would require – where it would charge its servers and bartenders at times for walk-outs, correct?
> A:     Yeah.
> Q:     Okay. So tell me what the policy was.
> A:     My policy was based on let's see what happened in the situation.  So there is plenty of times where a customer walks out, and you go back and look on the cameras, and you see they baited that employee. They waited for that employee to go behind the corner or go deal with another difficult party. And they just take off running. I comped every clear one of those.  Any time a customer maliciously trying to walk-out or get over on the server, we comped it.  Now, there was plenty of times – there is times where an employee would have a walk-out, and you go back and see what happened, and they were out smoking when they shouldn't have been or on their phone just not paying attention, and I would discount it and cash it out.  Well, they would cash it out.
> Q:     Okay. You would discount a walk-out?

---

[8] (Ex. 2 – Depo. of Cargill Excerpts, pp. 83-88; Ex. 3 – Depo. of Goodbread Excerpts, pp. 54, 63-65, 69-71; Ex. 4 – Depo. of Emde Excerpts, pp. 46-48, 50-51).

A:      Yeah.

                                          …

Q:      Okay. Did Beach House have a policy that required the servers or bartenders
        to pay for wrong orders?

A:      …It was a policy to investigate and see who was at fault.

                                          …

Q:      All right. So when you say you investigate, you might talk to the guest, but
        you are always going to believe that the guest was right?
        A:  Not always.

                                          …

A:      If the server was correct, I am going to comp it and give the customer what
        they need.
        Q:  How do you determine if the server or the guest are correct?
        A:  Judgment.

Q:      And if you decide that the server was wrong, Beach House could then require
        the server to pay for the wrong order?
        A:  Could.

Q:      Okay. And it is true that the main line entrees, they were not comped?
        A:  They were discounted. Typically, not comped. But I always-

Q:      I'm sorry. That was – my question should have been were the main line
        entrees not discounted. They were always required – the servers had to pay
        full price?

A:      No. I typically always discounted a minimum of 25 percent. Sometimes, they
        would eat it. They would get 50 percent off…

(Ex. 3 – Depo. of Goodbread Excerpts, pp. 63-64, 69, 70, 71).  Finally, Scott Emde has testified,

in pertinent part, as follows:

Q:      Did you always charge servers and bartenders for walk-outs when they had
        them?

A:      Not always.

Q:      What percentage – if you have an idea of what percentage you charged during
        your time there – during the time period?

A:      For a walk-out?

Q:      Yeah.

A:      Depending on the case on what the individual was doing always determined
        – 9 times out of 10, I usually took care of it depending on unless that
        employee was not doing their job completely and just ignoring their job by
        standing outside, not taking care of their tables and then their table just walks
        out, then I would make them pay for the walk-out.

                                          …

Q:      What factors led you to charge the server versus not charging them?

A:      Like I said, if they weren't doing their job properly, if I had to hunt them
        down, had to go find them, they were out back smoking, doing something
        else, messing with other employees, then you are not properly doing your job.

> If you are staying on top of your tables and you are just busy and then I take
> that into consideration.
>
> …
>
> Q:    What factors did you consider whether you required them to pay [wrong
>       orders] or not?
> A:    Just if it was busy, busy.  I understand that people make mistakes. But if
>       somebody is a repeat offender.

(Ex. 4 – Depo. of Emde Excerpts, pp. 46-47, 48, 50, 51).

With regard to silverware, Dave Goodbread testified he is who started charging for silverware; however, he only charged servers for silverware, not bartenders.  (See Ex. 3 – Depo. of Goodbread Excerpts, pp. 54, 77).  Billy Cargill testified he only charged for silverware three times; then, he no longer charged for silverware.  (See Ex. 2 - Depo. of Cargill Excerpts, pp. 86-88).  Scott Edme also confirmed that he and Billy Cargill stopped charging for silverware.  (See Ex. 4 – Depo. of Emde Excerpts, p. 51).

## 2.    Plaintiffs' Testimony

Similar to the testimony of the Beach House managers, Plaintiffs have also testified that whether they were required to pay, and the amount they were required to pay, for silverware, walkouts, and wrong orders *varied depending upon which manager was on duty, the managers' moods, and their relationship with the particular server or bartender*.[9]  For example, Plaintiff Holly Nygaard testified, as follows:

> Q:    Is it your testimony that every time a wrong order occurred that you always
>       had to pay?
> A:    Not always.
> Q:    And would that also apply to walk-outs too?
> A:    Correct.

---

[9] (See Ex. 6 – Depo. of Marrone Excerpts, pp. 22, 46-47; Ex. 7 – Depo. of Williams Excerpts, pp. 91-94, 98, Ex. 8 – Depo. of Powers Excerpts, pp. 25-26, Ex. 9 – Depo. of Moss Excerpts, pp. 30, 34; Ex. 10 – Depo of Byrd Excerpts, pp. 28, 31, Ex. 11 – Depo. of Miller Excerpts, pp. 32-33, 40-41; Ex. 12 – Depo. of Nygaard Excerpts, pp. 51, 74-75; Ex. 14 – Depo. of McColgan Excerpts – 54-55).

> Q:    So there were sometimes when there was a walk-out when you would not have to pay?
>
> A:    Correct.
>
> …
>
> Q:    Do you remember – can you as, we're sitting here today, recall any like guideline or policy that would say if this happens, you don't have to pay, but if this happens you do?
>
> A:    No.
>
> Q:    It basically – so for walk-outs and wrong order payments, it depended upon who the managers were on duty?
>
> A:    Correct, and their mood, and how much they liked the person, I would say, just being honest.

(Ex. 12 – Depo. of Nygaard Excerpts, pp. 74-75). Plaintiff Victoria Miller agreed with Plaintiff Holly Nygaard, and stated: "If [the manager] was in a bad mood, then you are paying for everything…If they are in an alright mood and it's the beginning of the day or either it was a good night, they would be very, okay, I will discount it." (Ex.11 – Depo. of Miller Excerpts, pp. 40-41). Plaintiff Madalynn Marrone testified that managers would require payments for walkouts on a case-by-case basis, and also depending upon their mood. (Ex. 6 – Depo. of Marrone Excerpts, pp 46-47). Plaintiff Maronne also testified that although she had customers walk out on tabs without paying, Beach House managers ***never required her to pay for walkouts***. (See Ex. 6 – Depo. of Marrone Excerpts, pp. 44-45, 46). Plaintiff Meredith Byrd testified that whether she had to pay for a wrong order depended upon which manager was working, the manager's mood, whether they liked her, and on a case-by-case basis. (See Ex. 10, p. 28, 31).

Based upon all testimony gathered in this lawsuit, there was no uniform policy applied to every server and bartender during the entire time period. Whether a server or bartender was required to pay for silverware, walkouts, or wrong orders varied, as were the amounts required to be paid for each. There was no uniform policy applied to everyone during the entire time period. Accordingly, there is no uniform method for determining which servers or bartenders were required to pay for silverware, walkouts, or wrong orders; or for when and how much servers or

bartenders were required to pay.  In sum, it ***cannot*** be assumed that every server or bartender at

was required to pay for silverware, walkouts, or wrong orders, and it is not possible to ascertain a

class of aggrieved individuals because they are not all similarly-situated.

**B.      How Often A Server or Bartender Was Required to Pay For Silverware, Walkouts, or Wrong Orders and the Amounts Servers and Bartenders Were Required to Pay for Silverware, Walkouts, and Wrong Orders, if Any, Varied Greatly.**

Each Plaintiff who has been deposed in this case has testified regarding his/her personal

experience working for Beach House; the frequency with which he/she alleges he/she was required

to remit payment for lost silverware, walkouts, and wrong orders; and the amount of money he/she

allegedly paid to Beach House for lost silverware, walkouts, and wrong orders.

 **1.      Silverware**

With regard to payments to Beach House for silverware, Plaintiffs have testified, as

follows.  Plaintiff William Lubeck testified he had to pay Beach House $15.00 for lost silverware

about three times each summer he was a server at Beach House.  (Ex. 15 – Depo. of Lubeck

Excerpts, pp. 20-21).  However, Plaintiff Holly Nygaard testified she could only recall paying

Beach House once for silverware, at a rate of between $5.00 to $10.00. (Ex. 12 – Depo. of Nygaard

Excerpts, p. 76).  Plaintiff Quanell Gee recalls only three times he paid for silverware, at a rate of

between $5.00 to $7.00 each time.  (Ex. 13 – Depo. of Gee Excerpts, pp. 43-45).  Plaintiff Alexis

McColgan testified paying for silverware was not a frequent thing and could only recall paying

Beach House for silverware one time, in the amount of $20.00.  (Ex. 14 – Depo. of McColgan

Excerpts, p. 51).

Plaintiff Dave Williams testified that he had to pay for silverware while he was working as

a server, but not as a bartender.  (See Ex. 7 – Depo. of Williams Excerpts, p. 106).  However,

during his deposition, Plaintiff Williams could not provide a specific number of times or amount

he paid for silverware.  (See Id. at pp. 106-110).  Plaintiff Amanda Powers testified the times Beach House would charge for silverware were "random," the amounts she was required to pay varied depending upon the manager on duty and season, and that she had to pay for silverware five times, "around $50.00" each time.  (See Ex. 8 – Depo. of Powers Excerpts, pp. 24, 25, 26).  Plaintiff Aisha Moss also testified that the times when Beach House required her to pay for silverware were "pretty random," and that she had to pay for silverware three to four times total through her employment at Beach House, in amounts between $12.00 to $35.00 per time.  (See Ex. 9 – Depo. of Moss Excerpts, pp. 17-18).

Plaintiff Madalynn Marrone testified she "probably paid for silverware like five or six times," in a different amount each time, the least amount being $15.00 and the highest amount $17.00.  (See Ex. 6 – Depo. of Marrone Excerpts, pp. 50-51).  Similar to Plaintiffs Powers and Moss, Plaintiff Marrone testified there was no real rhyme or reason as to when she had to pay for silverware.  (Id. at p. 51).  Plaintiff Meredith Byrd only recalls paying for silverware one time during her employment as a server at Beach House, in the amount of $17.00.  (See Ex. 10 – Depo. of Byrd Excerpts, p. 49).  Plaintiff Victoria Miller testified she paid between $5.00 and $15.00 for silverware, at varying frequencies depending on the season.  (See Ex. 11 – Depo. of Miller Excerpts, pp. 31-33, 35).

2.    **Walkouts**

With regard to walkouts, Plaintiff Holly Nygaard testified, on average, she paid for walkouts at least five times a week during her employment at Beach House, and that the amount she paid "could have been anything from a couple beers to over a hundred dollars."  (Ex. 12 – Depo. of Nygaard Excerpts, p. 62, 65).  Plaintiff William Lubeck testified he paid for walkouts about once a month from March to October, and less frequently in the remaining months of the

calendar years; and that the amount he paid was "always different." (See Ex. 15 – Depo. of Lubeck Excerpts, pp. 31-32). Plaintiff Quanell Gee testified he could only recall paying for a walkout one time during his employment by Defendant Beach House, in the amount of approximately $86.00. (Ex. 13 – Depo. of Gee Excerpts, pp. 41-42). Plaintiff Alexis McColgan testified she paid for walkouts a couple of times each week, and the amounts she paid "fluctuated." (Ex. 14 – Depo. of McColgan Excerpts, p. 61).

Plaintiff Dave Williams testified he paid for walkouts "about once a week" in varying amounts. (See Ex. 7 – Depo. of Williams Excerpts, p. 128). Plaintiff Amanda Powers testified she paid for walkouts about once a week, and paid an average of $8.00 each time. (See Ex. 8 – Depo. of Powers Excerpts, p. 34). Plaintiff Aisha Moss testified she paid for walkouts an average of three times per year during the three years she worked for Beach House during the relevant time period, and the average amount she paid was between $25.00 to $30.00. (See Ex. 9 – Depo. of Moss, pp. 24-25). Plaintiff Meredith Byrd testified she believes she paid for walkouts "maybe three or four times" per month; however, "[i]t could have been way less, way more." (See Ex. 10 – Depo. of Byrd, pp. 43-44). Plaintiff Byrd estimated the amount she had to pay each time for walkouts was "more than $10.00." (Id. at p. 45). Plaintiff Victoria Miller testified, in 2017, she had to pay for walkouts one to three times per week during the busy season, and one time per week during the slow season, in varying amounts. (See Ex. 11 – Depo. of Miller Excerpts, p. 50). Plaintiff Miller testified in 2018, she had to pay for walkouts three to four times per week in the busy season and maybe one time per week during the slow season. (Id. at p. 51).

In contrast to the foregoing Plaintiffs, Plaintiff Madalynn Marrone testified that even though she had customers walk out without paying, ***she was never required to pay for a walkout***

*during her employment at Beach House*.  (See Ex. 6 – Depo. of Marrone Excerpts, pp. 44-45, 46).

    **3.**    **Wrong Orders**

With regard to wrong orders, Plaintiff Holly Nygaard testified she was just occasionally required to pay for a wrong order and could only recall one specific instance where she did so. (Ex. 12 – Depo. of Nygaard Excerpts, pp. 71-73).  Plaintiff William Lubeck testified he had to pay for wrong orders at least once every two weeks during the summer months, and that it happened less frequently in the off season when it was less busy.  (Ex. 15 – Depo. of Lubeck Excerpts, pp. 28-29).  Plaintiff Quanell Gee testified he was required to pay for wrong orders more than ten (10) times.  (Ex. 13 – Depo. of Gee Excerpts, pp. 39-40).  Plaintiff Alexis McColgan testified she experienced wrong orders three to four times a week in fluctuating amounts.  (Ex. 14 – Depo. of McColgan Excerpts, p. 52, 55).

Plaintiff Dave Williams testified he paid for wrong orders around four times a week during the busiest time of the year, at varying amounts.  (See Ex. 7 – Depo. of Williams Excerpts, pp. 100-101, 103).  Plaintiff Amanda Powers testified she had to pay for wrong orders approximately five times at around $40.00 each time.  (See Ex. 8 – Depo. of Powers Excerpts, p. 28-29).  Plaintiff Aisha Moss testified she paid for wrong orders between seven to ten times in 2017; five to seven times in 2018; seven times in 2018 – with the lowest amount paid at $20.00 and the highest "probably $50.00."  (See Ex. 9 – Depo. of Moss Excerpts, pp. 34-35).

Plaintiff Madalynn Marrone testified she had to pay, on average, for about three wrong orders per week during the three summers she worked at Beach House, in an average amount of $50.00 per wrong order.  (See Ex. 6 – Depo. of Marrone, p. 42, 44).  Plaintiff Meredith Byrd testified she had to pay for wrong orders around two to three times per month during her

employment at Beach House, around $10.00 to $30.00 each time. (See Ex. 10 – Depo. of Byrd Excerpts, pp. 30, 34, 35-36). Plaintiff Victoria Miller testified she had to pay for wrong orders four to five times per week, and the amount she paid varied a lot. (See Ex. 11 – Depo. of Miller Excerpts, p. 41).

All of the deposition testimony outlined above reveals each Plaintiff's experience differs greatly from each of the others, depending upon a manager's discretion and the case-by-case circumstances. Each Plaintiff worked during different time periods under different managers, who either did or did not require servers and bartenders to pay for silverware, walkouts, or wrong orders, for different reasons. There is simply no way to determine, without conducting individualized inquiries, which servers or bartenders were ever required to make such payments; when they were required to pay; and the amounts they were required to pay. Therefore, Plaintiffs cannot establish they are representative of an entire class, nor that common questions, rather than individual issues, predominate such that a class action is proper method for resolving this case.

## IV.    ARGUMENT & LEGAL AUTHORITY

Plaintiffs' Motion to Certify Class should be denied because: (1) Plaintiffs' Motion is premised upon improper and incorrect assumptions; (2) Plaintiffs cannot demonstrate Plaintiffs' claims are typical of the claims of the class or that the representative parties will adequately protect the class; (3) Plaintiffs cannot demonstrate that common, not individual, questions predominate, or that class treatment is superior to all other forms of adjudication; (4) Plaintiffs cannot establish that their class is ascertainable without significant burden; and (5) Plaintiffs' Motion is untimely.

## A.    Plaintiffs' Motion Is Premised Upon Improper and Incorrect Assertions.

Plaintiff's Motion seeks this Court certify a class of "all individuals who were employed by Beach House, as servers or bartenders, at any time from January 24, 2017 through May 14,

2020." (See ECF No. 74-1, p. 2). Plaintiff then incorrectly asserts Defendants required "each and every" putative class member to pay, from their tips, for silverware, walkouts, and wrong orders. (Id. at p. 6).

First, the deposition testimony in this lawsuit reveals that not even *every* Plaintiff who is currently participating in this case was required to pay for a walkout. (See Ex. 6 – Depo. of Marrone Excerpts, pp. 44-45, 46). Further, the testimony herein evidences that silverware payments were only required of servers, and Beach House managers, Billy Cargill and Scott Emde ended charges for silverware during the relevant time period. (See Ex. 3 – Depo. of Goodbread Excerpts, pp. 54, 77; Ex. 2 - Depo. of Cargill Excerpts, pp. 86-88; Ex. 4 – Depo. of Emde Excerpts, p. 51). Therefore, Plaintiffs' assertion that the entire putative class was required to pay for silverware, walkouts, and wrong orders is completely false. Some servers and bartenders were required to pay Beach for silverware, walkouts, or wrong orders some of the time. Not all servers and bartenders were required to make these payments, nor were all servers and bartenders required to make these payments all of the time during the relevant time period.

As a result of Plaintiffs' false assertion that *all* servers and bartenders were required to pay for silverware, walkouts, and wrong orders, Plaintiffs improperly argue that to succeed on their claims, Plaintiffs only have to prove Beach House had policies requiring servers and bartenders to pay for silverware, walkouts, and wrong orders, and that those policies violated the SCPWA. (See ECF No. 74-1, p. 3). This argument falsely assumes that if a policy which violated the SCPWA was in place at Beach House, it automatically follows that such policy injured every single bartender and server. That is simply not the case here – as evidenced by the multitude of deposition testimony set forth above. As much as they seek to do so, Plaintiffs cannot frame this case like others where one uniform policy applied to all servers or bartenders without discretion.

(See infra Section III(A)(1)).  If facts such as those were present in this case, Defendants would likely concede certification of a Rule 23, FRCP, class.  Nonetheless, that type of evidence is nonexistent herein.  Instead, it is clear there was ***no uniform policy that injured every bartender and server at Beach House during the relevant time period.***

As a result of the foregoing, if a class were to be certified as requested by Plaintiffs, the this Court would still be charged with determining, as to ***each individual class member***, whether Beach House was ***liable*** to that class member (i.e., whether each server or bartender was ever required to pay and actually did pay Beach House for silverware, a walkout, or a wrong order), thereby rendering the class action model of disposition no different from the individual model of disposition.  Only after doing so could the Court then transition to a damages determination.  Therefore, although Plaintiffs advise the court Defendants will object to certification based on individualized inquiries regarding ***damages*** (see ECF No. 74-1, p. 14 fn 3),[10] the first inquiries the Court would have to make would be as to ***liability***.  As detailed in Section III(B)(2) below, these liability inquiries are the exact fact-specific, individualized inquiries that District Courts have found render class certification improper.  Plaintiffs' incorrect and improper assertions thus fatally flaw Plaintiffs' Motion to Certify and their Motion should be denied.

1.    <u>The Cases Plaintiffs Rely Upon Within Their Motion to Certify Are Distinguishable From This Case.</u>

In addition to the foregoing, Plaintiffs argue "[i]ndeed, similar challenges under state laws to an employer's rules requiring deductions and payments back to the employer routinely have

_____

[10] Plaintiffs cite two cases for the proposition that a case in which damages alone involves questions of individuals is not sufficient to defeat class certification.  (See ECF No. 74-1, p. 14, fn 3). Defendants agree.  What is distinguishable about the present case is not a matter of damages; it is a matter of liability.  Whether each individual plaintiff was subject to and aggrieved by an alleged improper deduction is an individual inquiry since there was no uniform, mandatory policy enforced equally against all proposed class members.

been held to satisfy the commonality requirement…." (See ECF No. 74-1, p. 9).  This statement is ***false***.

Plaintiffs cite four cases in support of the above-contention.[11]  However, not one of the four cases Plaintiffs rely upon involves "a policy of requiring its Tipped Employees to pay Defendants, from their tips, for Walkouts; Wrong Orders; and Silverware," as Plaintiffs allege occurred in this case.  (See ECF No. 74-1, p. 9).  On the contrary, each case involves a mandatory, uniform policy that applied to and affected an entire class of individual employees equally, thereby allowing one representative member of that class to bring an action on behalf of the entire class on the issue of liability.  The class certification model was arguably appropriate in each of these cases, for they were predicated upon typical non-discretionary, uniform payroll policies that applied to and were enforced against all employees within a given time period.  By contrast, the case at hand presents a different fact pattern, rooted in evidence which demonstrates discretionary, intermittent charges made by some managers against some servers and/or bartenders either some of the time, or, by some plaintiffs' own admissions, not at all.

Two of the four cases cited by Plaintiffs, out of the district courts of Pennsylvania and New York, were simply orders approving consent motions to approve class-based settlement agreements, neither of which analyzes the issue of whether a discretionary policy of intermittent deductions, standing alone, is proper for class certification.  First, in Graudins v. Kop Kilt, LLC, 2017 U.S. Dist. LEXIS 25926 *, 2017 WL 736684 (E.D. Pa. Feb. 24, 2017), the order approving settlement reveals the true crux of the case and class settlement centered on a class of tipped

---

[11] Grauden v. Kop Kilt, LLC, 2017 U.S. Dist. LEXIS 25926 *, 2017 WL 736684 (E.D. Pa. Feb. 24, 2017); Martinez v. Ayken, Inc., 2016 U.S. Dist. LEXIS 25556 * (E.D.N.Y. Feb. 29, 2016); Tiro v. Pub. House Invs., LLC, 288 F.R.D 272 (S.D.N.Y. 2012); and Johnson v. Brennan, 2011 U.S. Dist. LEXIS 105775, 2011 WL 4357376 (S.D.N.Y. Sept. 16, 2011).

employees who were not notified that their employer was taking the tip credit and were paid less than the minimum wage for the hours they worked.  Id. at *2, 10.  This statement is supported by the Court's analysis of the predominance element of the class, in which the Court reasoned that:

> Defendants allegedly instituted an unlawful wage system in which *all* tipped employees did not receive notification of Defendants' tip credit practices and were not paid the statutory minimum wage for their working hours. Therefore, *all class members* were harmed by Defendants' conduct, and the common questions of law or fact predominate over any questions affecting only individual members.

Id. at *13 (emphasis added).  In contrast to the present case, the <u>Kop Kilt</u> Court noted throughout its opinion that each of the alleged violations of both state and federal law applied to ***all class members***.[12]  Second, in <u>Johnson v. Brennan</u>, 2011 U.S. Dist. LEXIS 105775, 2011 WL 4357376 (S.D.N.Y. Sept. 16, 2011), the Complaint filed by a class of restaurant employees did not allege their employer made illegal deductions from their wages or tips.  Rather, the case involved issues of  "whether Defendants: (1) misappropriated tips by unlawfully distributing a portion to tip-ineligible fromagers and maître d's; (2) failed to pay spread-of-hours pay; (3) failed to reimburse workers for the cost of required uniforms; and (4) failed to pay statutory uniform maintenance payments."  2011 U.S. Dist. LEXIS 105775 at *13-14.  The Court approved the proposed class, holding that the alleged violations involved "common operative facts stemming from corporate policies that affected class members ***in the same way***…."  Id. at *14 (emphasis added).  Yet again, this case and the present case are vastly different from one another.

---

[12] Id. at *9 (emphasis added) ("the class members…were *all* tipped employees who allegedly (3) paid for cash shortages….") (emphasis added); Id. at *11 ("the Representative Plaintiff challenges the conduct that Defendant allegedly applied to ***every other identified class member***….") (emphasis added); and Id. at *15 ("***all members*** of the Collective advance the same claims….") (emphasis added).

The second two cases, each out district courts in New York, are rulings upon contested motions seeking class certification, but neither analyzes or rules upon the issue of whether a discretionary policy of intermittent deductions is proper for class certification. First, in <u>Martinez v. Ayken, Inc.</u>, 2016 U.S. Dist. LEXIS 25556 * (E.D.N.Y. Feb. 29, 2016), a class of restaurant employees challenged their restaurant's uniformly applicable payment practices to tipped employees, namely "(1) failing to pay tipped employees proper minimum wage and overtime compensation based upon a policy of taking an invalid tip credit; (2) failing to pay a 'spread of hours' premium; (3) engaging in improper 'time shaving'; and (4) providing improper wage and hour notices." <u>Id.</u> at *25. The plaintiffs alleged that the aforementioned policies and practices "were an enterprise-wide policy" that applied to and affected, uniformly, all employees in the proposed class. <u>Id.</u> at *26. In approving the Plaintiffs' motion for class certification, the Court held that "the proposed class was subjected to a uniform policy that existed across the named corporations…." <u>Id.</u> at *30. The Court supported its opinion by citing another district court case from the Southern District of New York, which held "***As long as plaintiffs assert that defendants committed the <u>same wrongful acts in the same manner against all members of the class</u>, they establish necessary typicality***." <u>Id.</u>, (quoting <u>Bolanos v. Norwegian Cruise Lines Ltd.</u>, 212 F.R.D. 144, 155 (S.D.N.Y 2002)) (emphasis added). As discussed above, such is not the case with Beach House. The second case, <u>Tiro v. Pub. House Invs., LLC</u>, 288 F.R.D. 272 (S.D.N.Y 2012), was primarily focused upon a restaurant's payroll practice that applied uniformly to all employees. In <u>Tiro</u>, the predominant issue was "whether Defendants ***systematically*** failed to pay its employees the prevailing wages due them," characterized as minimum wage, overtime, and spread-of-hours premiums. 288 F.R.D. at 281 (emphasis added). The allegations of tip stealing and misappropriation were hardly analyzed in the Court's order and are, as such, assumed to be

ancillary at best.  Moreover, the defendants in <u>Tiro</u> did not contest the uniform applicability or enforcement of the latter policies against the class members.  Yet again, this case and the present case are apples and oranges.

The facts and issues in each of the foregoing cases differ greatly from those of the present case.  Therefore, Plaintiffs have improperly relied upon such cases for the proposition that "similar challenges under state laws…have been held to satisfy the commonality requirement."  (<u>See</u> ECF No. 74-1, p. 9).

**B.**    **<u>Plaintiffs Cannot Satisfy the Requirements Set Forth in Rule 23, FRCP.</u>**

A class action is "'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'"  <u>Reinig v. RBS Citizens, N.A.</u>, 912 F.3d 115, 123 (quoting <u>Walmart Stores, Inc. v. Dukes</u>, 564 U.S. 338 (2011).  The prerequisites for a class action are established by Rule 23(a) of the Federal Rules of Civil Procedure, which states, as follows:

> (a) Prerequisites to a Class Action.  One or more members of a class may sue or be sued as representative parties on behalf of all ***<u>only if</u>*** (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a) (emphasis added).  The four aforementioned prerequisites are referred to as "numerosity," "commonality," "typicality," and "adequacy of representation."   <u>Fisher v. United States</u>, 501 F.Supp.3d 362, 364 (D.S.C. 2020).

In addition to these prerequisites, a plaintiff seeking class certification must also satisfy the requirements for maintenance of a class action set forth in Rule 23(b)(3), <u>FRCP</u>. <u>Id.</u> Rule 23(b)(3), <u>FRCP</u>, requires that common, not individual, questions predominate and that class treatment is superior to other forms of adjudication.  "Certification under Rule 23(b)(3) is proper where 'the

questions of law or fact common to the members of the class predominate over any questions affecting only individual members,' and, to resolve the case, 'a class action is superior to other methods available.'" Fisher, 501 F.Supp.3d at 364 (citing Fed. R. Civ. P. 23(b)).  Although it is similar to the commonality requirement under Rule 23(a), the predominance requirement "is far more demanding." Jenkins v. White Castle Mgmt. Co., 2015 U.S. Dist. LEXIS 22241, 2015 WL 832409, *7 (N.D. Ill. Feb. 25, 2015).[13]  "'Rule 23(b)(3)'s predominance requirement is satisfied when common questions represent a significant aspect of a case and can be resolved for all members of a class in a single adjudication.'" White Castle, 2015 U.S. Dist. LEXIS 22241 *7 (quoting Messner v. Northshore Univ. Healthsystem, 669 F.3d 802, 814 (7th Cir. 2012)).

The class must also be "sufficiently definite that is members are ascertainable." Jamie S. v. Milwaukee Pub. Schs., 668 F.3d 481, 493 (7th Cir. 2012).  Although this does not mean that every member of a class needs to be identified at the time of certification, "there must be an 'administratively feasible [way] for the court to determine whether a particular individual is a member' at some point." Katz v. Capital Med. Educ., LLC, 2021 U.S. Dist. LEXIS 147830, 2021 WL 3472809 *12-13 (D.S.C. Aug. 6, 2021) (quoting Krakauer v. Dish Network, LLC, 925 F.3d 643, 658 (4th Cir. 2019)).[14]  Plaintiffs must establish each Rule 23, FRCP, element "by a preponderance of the evidence." Messner, 669 F.3d at 811.

1.     **Plaintiffs' Cannot Demonstrate Their Claims Are Typical of the Claims of the Class, Nor That Plaintiffs Can Adequately Represent the Class.**

Rule 23(a), FRCP, requires Plaintiffs to demonstrate both that the claims or defenses of the representative parties are typical of the claims or defenses of the class, and the representative

---

[13] A copy of the Jenkins v. White Castle Mgmt. Co. case is attached hereto for the Court's review as "Exhibit 16."

[14] A copy of the Katz v. Capital Med. Educ., LLC case is attached hereto for the Court's review as "Exhibit 17."

parties will fairly and adequately protect the interests of the class.  Plaintiffs cannot do so in this lawsuit.  As discussed at length above, Beach House did not have a uniform policy that was enforced against every single bartender or server.  Beach House's managers, at their own discretion, on a case-by-case basis, required *some* bartenders and servers to pay for silverware, walkouts, or wrong orders.  Therefore, what each Plaintiff was required to pay for, versus not pay for, differs entirely from another Plaintiff or putative class member.  For example, if Plaintiff Holly Nygaard proves she had to pay for wrong orders, such proof would have zero effect on whether Beach House is liable to any other servers and bartenders for wrong order payments.  By her *own admission*, Holly Nygaard has testified that managers charged employees differently based on a variety of factors, or not at all.  (Ex. 12 – Depo. of Nygaard Excerpts, pp. 74-75).  Each individual Plaintiff or putative class member still has to prove he or she had to pay for wrong orders in order to establish Beach House's liability to that particular individual.  The same would be true for silverware charges and walkout charges.

At first glance it is easy to see how Plaintiffs may argue that their claims are the same claims as other servers and bartenders, as each of the Plaintiffs is complaining of generally the same things – that they had to pay for silverware, or a walkout or wrong order.  However, what is lacking here is regardless of how many plaintiffs participate in this case, each will still have to independently prove he or she was required to pay for silverware, a walkout, or a wrong order at some point during the relevant time period; and only each individual server or bartender can prove that for his or herself.  For these same reasons, none of the representative plaintiffs can fairly or adequately represent the class.  Again, this key distinction relates back to the fatal flaw in Plaintiffs' Motion to Certify, which is that Beach House did not uniformly or automatically charge every server or bartender throughout the relevant time period for silverware, walkouts, or wrong

orders. Therefore, Plaintiffs cannot establish the typicality or adequacy of representation requirements of Rule 23(a), <u>FRCP</u>; and Plaintiffs' Motion to Certify should be denied accordingly.

> **2.** **<u>Plaintiffs' Cannot Demonstrate That Common, as Opposed to Individual Questions, Predominate and that Class Treatment Is Superior to All Other Forms of Adjudication.</u>**

As is shown by the testimony of Beach House's managers and the Plaintiffs who have already joined this lawsuit, an individualized inquiry as to each server or bartender is required to determine whether Beach House is liable to such server or bartender. Therefore, it is clear that individual questions predominate in this case, class treatment is not superior in this lawsuit, and Plaintiffs cannot meet the requirements of Rule 23(b)(3), <u>FRCP</u>. In four cases comparable to this matter, district courts have found class certification was inappropriate where highly individualized inquiries were necessary to establish liability and damages.

In the <u>Jenkins v. White Castle Mgmt. Co.</u>, No. 12 CV 7273, 2015 U.S. Dist. LEXIS 22241*, 2015 WL 832409 (N.D. Il. Feb. 25, 2015) case, the District Court for Northern District of Illinois denied Plaintiffs' motion for class certification under Rule 23. In <u>White Castle</u>, the plaintiffs were employed by the fast-food chain, White Castle, and were tasked with guest service, quality control, sanitation, cash handling, and safety. 2015 U.S. Dist. LEXIS 22241 at *2. The plaintiffs in <u>White Castle</u> alleged that although the defendant had a policy prohibiting employees from personally repaying cash register shortages or safe shortages, the defendant required the plaintiffs to pay such shortages as a matter of policy. <u>Id.</u> at *4-5. Similar to the case at hand, in <u>White Castle</u>, no records existed of any employee payments for drawer or safe shortages, White Castle did not make payroll deductions for shortages, and no payroll records reflect any such deductions. <u>Id.</u> at *5. Rather, all plaintiffs allege that they paid cash to Defendant for the shortages. <u>Id.</u> at *12. The Court in <u>White Castle</u> denied class certification on two grounds: (1) that the class was not "sufficiently definite

that its members are ascertainable;" and (2) that individual issues predominate over common questions, which can be resolved for all members of a class in a single adjudication. Id. at *16, 19-20.

With regard to ascertainability, the District Court for the Northern District of Illinois stated that "given the lack of objective criteria, 'identifying the class would be tremendously burdensome' in this case, since the court would have to hear and assess testimony from each individual employee to ascertain class membership.'" Id. at *14. Further, the Court reasoned that the plaintiffs had not presented any method for ascertaining class membership other than holding individual hearings to consider the testimony of each purported class member. Id. at *15-16. As a result, the Court held that class action treatment would not be an efficient means to resolve the case, since the court would have to hear individualized, incident-specific testimony to establish each allegedly compelled payment for every class member. Id. at *16.

With regard to predominance, the White Castle Court held that Plaintiffs have failed to show that the question common to the purported class, i.e., whether the General Manager's alleged policy of compelling employees to pay for drawer and safe shortages violated the state wage and hour act, predominates over individual questions of liability and damage. Id. at *17. The plaintiffs' evidence in White Castle was primarily their own testimony and declarations, which did not show that the claim was subject to generalized proof. Id. at *17-18. Plaintiffs could not remember specific instances of repayment of shortages, did not have records of compelled payments, and did not know how much they paid for the shortages. Id. at *18. Instead, they testified that it always varied between $2 and $30. Id. at *19. With regard to other employees, the Court had no way to tell whether they were injured at all, and, if so, to what extent, other than by taking individual testimony. Id. Therefore, the White Castle Court found every member of the

class would have to testify regarding the date, amount, and circumstances of each alleged shortage

payment; and given the necessity of extensive individual testimony to determine who sustained an

injury similar to that of the named plaintiffs, the plaintiffs had not demonstrated issues common

to class members predominated over questions affecting individual members.  Id. at *20.  The

White Castle case is directly comparable to the matter at hand.  The deposition testimony herein

evidences that there is no generalized proof of Plaintiffs' claims.  Rather, individual testimony

must be taken from each putative plaintiff.

Similarly, in Fisher v. United States, 501 F.Supp.3d 362 (D.S.C. 2020), the District Court

for the District of South Carolina denied plaintiffs' Motion for Class Certification under Rule 23,

FCRP, where it found there were significant, individual issues as to liability, defenses, and

damages that predominated over the single common question of whether such plaintiffs' unearned

wages included overtime.  In Fisher, the plaintiffs were individuals who worked for agents of the

U.S. as seamen on public vessels run by the U.S. Military Sealift Command ("MSC").[15]   501

F.Supp.3d at 362.  The plaintiff in Fisher was injured aboard the vessel where he was working and

found not fit for duty.  Id. at 364.  Following discharge, the plaintiff's employer (i.e., the company,

Maersk, who contracted with MSC) paid the plaintiff unearned wages covering the plaintiff's base

daily wages aboard the vessel through the end of his maximum tour.  Id.  However, Maersk did

not pay the plaintiff the unearned overtime wages the plaintiff contended he would have earned

during his voyage.  Id.  Therefore, the Fisher plaintiff sought to represent a class of seamen who

claim overtime wages as part of the unearned wages remedy under admiralty law.  Id. at 363.  More

---

[15] MSC has three programs that include public vessels crewed by seaman not employed by the
United States – rather, MSC contracts with private companies to operate public vessels, and the
private companies employ the seaman.  501 F.Supp.2d at 362.  The private companies also handle
the payment of maintenance, cure, and unearned wages should a seaman become ill or injured
while in the vessel's service.

specifically, the <u>Fisher</u> plaintiff sought class certification on behalf of all seaman who were injured or became ill while working for various contractors of the United States, who were paid maintenance, cure, and unearned wages by their contractor employers that did not include unearned overtime wages they asserted they would have otherwise earned. <u>Id.</u> at 365.

Similar to Plaintiffs in this case, the plaintiff in <u>Fisher</u> asserted class certification was appropriate because the plaintiff and the proposed class members were "asserting the same legal claim against Defendant's uniform course of conduct" (i.e., that the seaman were not paid for unearned overtime they were entitled to under admiralty law). <u>Id.</u> at 365. Also, similar to the Plaintiffs in this case, the <u>Fisher</u> plaintiff asserted, "Defendant's liability for overtime based upon unearned wages is the central legal focus in this litigation and predominates over any questions affecting only individual members" and that common factual and legal issues relating to entitlement to unearned overtime wages predominate over individual damage calculations. <u>Id.</u> Similar to Defendants' stance herein, in <u>Fisher</u>, the United States opposed class certification on the grounds that the individual issues predominated.

The District Court for the District of South Carolina agreed with the <u>Fisher</u> defendants. <u>Id.</u> at 366. In <u>Fisher</u>, the District Court held that even if the plaintiffs in <u>Fisher</u> were united under the common issue of whether the class was entitled to payment of unearned overtime wages, the fact that ***the seaman <u>must first show</u> that he or she was <u>entitled to</u> unearned wages*** (e.g., such as proof the plaintiff routinely worked overtime while on the vessel) was a heavily individualized, fact-specific inquiry that rendered the action inappropriate for class certification. <u>See</u> <u>Id.</u> (emphasis added). Additionally, although the <u>Fisher</u> plaintiff suggested the class could be further narrowed in an effort to include those parties entitled to unearned overtime pay, the Court held that to do so would still "require[] an intensely fact-dependent inquiry unique to each class member." <u>Id.</u> In

sum, comparable to the matter at hand, in <u>Fisher</u>, the District Court of South Carolina found that class certification was inappropriate where individual, fact-specific inquires would have to be made of each class member to determine whether each class member was entitled to the legal remedy sought.

In another comparable action, <u>Franks v. MKM Oil, Inc.</u>, No. 10 CV 00013, 2012 U.S. Dist. LEXIS 128205*, 2012 WL 3902782 (N.D. Il. Sept. 7, 2012), the District Court for the Northern District of Illinois denied class certification for lack of ascertainability and predominance.[16] In <u>Franks</u>, the plaintiffs were gas station employees who claimed, amongst other things, their employer required them to pay for business losses sustained as a result of drive-off customers and cash shortfalls. <u>Id.</u> at *5. The Defendant's written employee policies contained a policy stating that if proper steps were not taken by employees, they employee would be responsible for payment of a drive-off and additional corrective action could/would result. <u>Id.</u> *7. Like the Court in <u>White Castle</u>, the District Court in <u>Franks</u> found that the proposed class was not ascertainable or sufficiently definable. <u>Id.</u> at *19.

In order to identify class members in <u>Franks</u>, the Court would have had to determine which employees made cash payments, and there was little to no evidence of any of the payments, or which employees had been required to make such payments. <u>Id.</u> at *20-21. Therefore, even if it was possible to identify a class, the Court in <u>Franks</u> found it would be tremendously burdensome to do so. <u>Id.</u> at *21. Further, the <u>Franks</u> Court held that the plaintiffs could not meet the predominance standard because individual issues would predominate. <u>Id.</u> at *22. Each employee allegedly paid cash to their manager directly. <u>Id.</u> Therefore, even if there was a common, uniform

---

[16] A copy of the <u>Franks v. MKM Oil, Inc.</u> case is attached hereto for the Court's review as "Exhibit 18."

policy across all retail locations to have the employees pay for drive-offs, determining which employees were affected would require a highly individualized analysis, a huge number of employees would have to be questioned, and if any receipts for such payments existed, such receipts would have to be matched to employment records. Id. at *22-23. Accordingly, the Court in Franks held that resolving the claim would require an extraordinarily individualized analysis that would predominate over any common issues, and denied class certification as to the employees' claims regarding payment of shortages. Id. at *23.

In, Reinig v. RBS Citizens, N.A., 912 F.3d 115 (3rd Cir. 2018), the Third Circuit vacated and remanded in part the lower court's certification of a class under Fed. R. Civ. P. 23. In Reinig, the plaintiffs worked as Mortgage Loan Officers for the defendant, and were responsible for bringing in business by generating customer leads, completing loan applications, and building a book of business of referrals for new mortgage lending opportunities. 912 F.3d at 121. The Reinig plaintiffs were paid a base salary, had the ability to earn commissions, and were entitled to overtime pay by virtue of their non-exempt status under federal and state wage and hour laws, including the FLSA. Id. at 122. The defendant in Reinig required the plaintiffs to report all time worked, including overtime, on a time sheet; and also required plaintiffs to obtain prior approval from his or her supervisor for any overtime hours worked. Id. However, the plaintiffs in Reinig alleged the defendant endorsed a "policy-to-violate-the-policy," i.e., the defendant maintained an unofficial, companywide policy of requiring plaintiffs to work in excess of 40 hours per week while discouraging them from actually reporting those overtime hours. Id. The Reinig plaintiffs contended this practice was carried out "through a single, coordinated, overarching scheme." Id.

The Third Circuit in Reinig outlined the standard for analyzing whether class certification was appropriate, holding that the predominance requirement of Rule 23(b)(3) "imposes a more

rigorous obligation upon a reviewing court to ensure that issues common to the class predominate over those affecting only individual class members." 912 F.3d at 127 (internal citations omitted). "At the class certification stage, the predominance requirement is met only if the district court is convinced that 'the essential elements of the claims brought by a putative class are capable of proof at trial through evidence that is common to the class rather than individual to its members.'" Id. In order for plaintiffs' representative evidence to satisfy the commonality/predominance requirements of Rule 23, "that evidence must be sufficiently representative of the class as a whole such that each individual plaintiff could have relied on the sample to establish liability if he or she had brought an individual action. Id. at 128. In Reinig, the Third Circuit found that not only were the plaintiffs' experiences confined to interactions with specific managers in distinct offices, but their statements were dissimilar and oftentimes ambiguous, reflecting in many instances nothing more than typical workplace concerns about work ethic and effectiveness. Id. at 129. Therefore, the Third Circuit vacated the lower court's order certifying a class.

The above cases are directly analogous to this matter. Deposition testimony herein demonstrates that certain of Beach House's managers on duty required servers and/or bartenders to pay for silverware, walkouts, and wrong orders intermittently and on a case-by-case, highly subjective basis. Plaintiffs have not established Beach House required every server or bartender to pay for silverware, walkouts, and wrong orders. Thus, some putative plaintiffs may have had to remit payment to Beach House for silverware, walkouts, and/or wrong orders, and others did not. Payments, if and when required, also varied greatly and were paid in cash directly to whichever manager was on duty during a particular shift. There is simply no generalized proof that a class member can rely upon. No different than in the White Castle, Fisher, Franks, and Reinig cases discussed above, each putative class member would first have to show he or she was

required to pay for either silverware, a walkout, or a wrong order during the relevant time period in order to establish liability in this case. Therefore, establishing liability requires fact-specific, individualized inquiries, of every single putative class member, which renders class treatment inappropriate.[17]

Even once liability determinations have been made, there is no one formula that can be applied for determining damages. The amount of times a server or bartender had to make payment to Beach House will be highly individualized and vary by employee. For example, Plaintiff Holly Nygaard's alleged damages are completely different from Plaintiff Quanell Gee's alleged damages, and every other Plaintiff's alleged damages. In sum, even if this case is certified as a class action, the Court would be forced to manage the case no differently than over fifty individual matters. No one adjudication would be sufficient to address liability or damages for each individual plaintiff. This renders the class mechanism inefficient and utterly useless. As a result of the foregoing, Plaintiffs cannot meet the requirements of Rule 23(b)(3), FRCP, as individualized issues regarding liability clearly predominate herein and the class mechanism is not superior to other forms of adjudication in this case. Plaintiffs' Motion to Certify should thus be denied.

### 3.    Plaintiffs' Cannot Demonstrate Their Class Is Ascertainable Without Significant and Burdensome Individual Inquiries.

For purposes of brevity, Defendants incorporate all arguments set forth above in this section, as well. In short, because there was no uniform policy applied to all servers and bartenders all of the time, individual inquiries are necessary to ascertain a class that was affected by Beach House's managers' intermittent and discretionary charges for silverware, walkouts, and wrong

---

[17] See Reinig, 912 F.3d 115 (3rd Cir. 2018), Fisher, 501 F.Supp.3d 362 (D.S.C. 2020), White Castle, 2015 U.S. Dist. LEXIS 22241 *, 2015 WL 832409 (N.D.Ill. Feb. 25, 2015), and Franks, 2012 U.S. Dist. LEXIS 128205 *, 2012 WL 3003782 (N.D.Ill. Sep. 7, 2012).

orders. "In the Fourth Circuit, class certification is not appropriate when 'class members are impossible to identify without extensive and individualized fact-finding' as it needs to be administratively feasible for the court to determine which individuals are members of the class." Katz, 2021 U.S. Dist. LEXIS 147830, 2021 WL 3472809 at *13 (quoting EQT Prod. Co. v. Adair, 764 F.3d 347, 358 (4th Cir. 2014) (holding if class members are impossible to identify without extensive and individualized fact-finding or mini trials, then a class action is inappropriate)). Where the practical issue of identifying class members is overly problematic, the court should consider that the administrative burden of certification may outweigh the efficiencies expected in a class action.  Katz, 2021 U.S. Dist. LEXIS 147830, 2021 WL 3472809 at *13-14 (internal citations omitted).  Thus is the case here, where such extensive, individual inquiries are needed to determine the makeup of the class. Therefore, class membership cannot be ascertained without significant burden and it is not efficient to certify this case as a class action.  Plaintiff's Motion to Certify should thus be denied.

**4.     <u>Plaintiffs' Motion to Certify is Untimely</u>**.

Finally, Plaintiffs' Motion to Certify should be denied as untimely.  Rule 23(c)(1)(A), <u>FRCP</u>, states the time to issue a certification order is "at an early practicable time after a person sues or is sued as a class representative…"  The Named Plaintiffs filed this case on January 23, 2020.  Nearly two years have now passed and extensive discovery has been conducted herein. Trial in this case is scheduled for on or after April 25, 2022 – less than four months from the present date.  Granting class certification at this stage in litigation would severely prejudice Defendants by necessitating a significant amount of additional discovery and attorney's fees, and would delay trial in this case indefinitely.  Therefore, in addition to all other bases set forth herein, Defendants' respectfully request this Court deny Plaintiffs' Motion to Certify as untimely.

## <u>CONCLUSION</u>

For the reasons set forth hereinabove, Defendants respectfully request Plaintiffs' Motion to Certify be denied.

Respectfully submitted,

**BELLAMY, RUTENBERG, COPELAND, EPPS, GRAVELY & BOWERS, P.A.**

s/Benjamin A. Baroody
Benjamin A. Baroody District Court I.D. No. 9442
Holly M. Lusk District Court I.D. No. 12587
Post Office Box 357
Myrtle Beach, South Carolina 29578-0357
843-448-2400
843-448-3022
bbbaroody@bellamylaw.com
hlusk@bellamylaw.com
Attorneys for Defendants